### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re:<br><br>TMST, INC., *formerly known as* THORNBURG MORTGAGE INC., *et al.*,<br><br>      Debtors. | Chapter 11:<br><br>Case Nos. 09-17787, 17790-17792-DKW<br><br>(Jointly Administered under Case No. 09-17787) |
| JOEL I. SHER, Chapter 11 Trustee and ZUNI INVESTORS, LLC,<br><br>      Plaintiffs,<br><br>          -against-<br><br>COUNTRYWIDE HOME LOANS, INC. and BANK OF AMERICA CORPORATION,<br><br>      Defendants. | Adversary No. 11-00337-DWK |

### AMENDED COMPLAINT FOR BREACH OF CONTRACT

Joel I. Sher, Chapter 11 Trustee (the **Trustee** for (i) TMST, Inc. f/k/a Thornburg Mortgage, Inc. (referred to as **TMST**), (ii) TMST Home Loans, Inc. f/k/a Thornburg Mortgage Home Loans, Inc. (referred to as **TMHL**), (iii) TMST Hedging Strategies, Inc. f/k/a Thornburg Mortgage Hedging Strategies, Inc. and (iv) TMST Acquisition Subsidiary, Inc. f/k/a Thornburg Acquisition Subsidiary, Inc. (collectively, the **Debtors**)), and Zuni Investors, LLC (**Zuni Investors**, together with the Trustee, **Plaintiffs**) for their complaint against Countrywide Home Loans, Inc. and Bank of America Corporation, state as follows:

## INTRODUCTION

1.     This is an action for breach of two Mortgage Loan Purchase and Servicing Agreements (the **MLPSAs**) under which defendant Countrywide Home Loans, Inc. sold residential mortgage loans that were eventually deposited into Zuni Mortgage Loan Trust 2006-OA1, a securitization trust. In each MLPSA, Countrywide made numerous representations and warranties about the mortgage loans. Plaintiffs have investigated the true condition of the mortgage loans and have discovered that Countrywide breached those representations and warranties with respect to many of the loans. Before it filed for bankruptcy protection, TMHL requested loan files for many of the loans that are the subject of this lawsuit, because it had reason to believe that those loans did not comply with the representations and warranties that Countrywide made about them. After reviewing those files, TMHL issued repurchase demands. Countrywide did not repurchase those loans. On April 15, 2011, Plaintiffs sent a letter to Countrywide (1) renewing the pre-bankruptcy demand for repurchase, (2) demanding that Countrywide repurchase additional loans with respect to which Countrywide breached representations and warranties, and (3) demanding that Countrywide provide Plaintiffs with the mortgage loan files for the loans for which Plaintiffs do not have the loan files so that Plaintiffs may assess whether Countrywide breached representations and warranties with respect to additional loans. A true copy of the April 15 letter, without its appendices, is attached to this Amended Complaint as Exhibit 1. Countrywide has not repurchased the loans or provided the loan files. Indeed, even now, over 90 days after the April 15 letter was sent (and over three-years since TMHL's pre-bankruptcy demand for repurchase) Countrywide still has not responded to the repurchase demands.

## PARTIES, JURISDICTION & VENUE

2.     Plaintiff Joel I. Sher is the Court-appointed Chapter 11 Trustee for the Debtors.

3.      Plaintiff Zuni Investors, LLC is the holder of certificates issued by Zuni Mortgage Loan Trust 2006-OA1 (referred to as the **Trust**). Zuni Investors owns 100% of the certificates issued by the Trust that carry any economic value and 98% of the voting rights of the certificates issued by the Trust. In March 2011, Zuni Investors and the Trustee entered into a Joint Prosecution Agreement to bring this claim and other claims like it.

4.      Defendant Countrywide Home Loans, Inc. (referred to as **Countrywide**) is a corporation organized under the laws of New York with its principal place of business in Calabasas, California.

5.      Defendant Bank of America Corporation (referred to as **BAC**) is a corporation organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina. BAC owns numerous subsidiaries, which together with BAC will be referred to collectively as **Bank of America**. As alleged below, BAC is liable to Plaintiffs under the doctrine of successor liability.

6.      This Court has jurisdiction over the subject matter of this Adversary Proceeding pursuant to 28 U.S.C. Sections 157 and 1334.

7.      This is a core proceeding pursuant to 28 U.S.C. Section 157(o).

8.      Venue in this Court is proper pursuant to 28 U.S.C. Section 1409.

## SECURITIZATION OF MORTGAGE LOANS

9.      The certificates that Zuni Investors owns are **mortgage-backed securities,** created in a process known as **securitization**. Securitization is the assembly of assets, such as loans secured by mortgages on residential properties on which borrowers are obligated to make payments, usually monthly, and the corresponding issuance of securities. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as **underwriting**. The purpose of underwriting is to

3

ensure that loans are made only to borrowers of sufficient income and credit standing to repay the borrowed amounts, and that the loans are made only against sufficient collateral. The originator applies its **underwriting standards** in the loan underwriting process.

10.     TMHL is a real-estate investment trust subsidiary of TMST that was formed in 1999 to originate, acquire, securitize and service residential mortgage loans. TMHL operated as a residential mortgage lender in all fifty states. In addition to its origination activities, TMHL also acquired mortgage loans through its correspondent lending program and secondary market purchases. Once TMHL had acquired a predetermined amount of mortgage loans, TMHL sponsored a securitization of those mortgage loans.

11.     In a securitization, a large number of loans are grouped into a **collateral pool.** The originator sells those loans along with the right to receive the related payments of principal and interest to a **depositor**, which in turn sells the mortgage loans to a **trust.** The trust pays the depositor cash for the loans. The trust raises the cash to pay for the loans by selling securities, usually bonds called **certificates,** to investors such as Zuni Investors. Each certificate entitles its holder to an agreed part of the proceeds from the loans in the collateral pool.

12.     Because the proceeds from the loans in the collateral pool of a securitization are the primary source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool. The most important information about the credit quality of those loans is contained in the files that the originator develops while underwriting and making those loans, the so-called **loan files**. For residential mortgage loans, each loan file normally contains comprehensive information from the borrower's loan application, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file also includes notes from the person who underwrote the

loan about whether or not the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified departure from those standards. To assure investors that the credit quality of the loans in the collateral pool is as the parties agreed, the originator or other seller of loans makes detailed **representations and warranties** about the loans, including representations and warranties about many characteristics of the loans relevant to their credit quality.

## THE LOANS IN THE TRUST

13.     When the Zuni Mortgage Loan Trust 2006-OA1 securitization closed, on June 29, 2006, the Trust held 2,314 mortgage loans. TMHL acted as the sponsor of the Trust and transferred the 2,314 mortgage loans it had acquired from third parties to Greenwich Capital Acceptance, Inc., as depositor, pursuant to a Mortgage Loan Purchase Agreement dated June 1, 2006. Greenwich Capital Acceptance, Inc. transferred the loans to the Trust pursuant to a Pooling and Servicing Agreement (the **PSA**) dated June 1, 2006. 1,270 of those 2,314 loans were originated by Countrywide.

14.     Of the 1,270 loans in the Trust that were originated by Countrywide, 32 have been liquidated at a loss to the Trust of $18,545,504, 915 loans were liquidated or repaid with no loss to the Trust,[1] and 323 loans are still owned by the Trust. Of the 323 loans that are still owned by the Trust, many are in foreclosure or are "real estate owned." (A loan that is real estate owned has been foreclosed upon but not yet liquidated, and the Trust still owns the property that secured the loan.)

---

[1] With respect to at least one loan on which the Trust has no current loss, Countrywide breached representations and warranties about the loan, and the Trust initially suffered a loss. After Thornburg sued Countrywide, Countrywide settled the claim and directly reimbursed the Trust (not Thornburg) for the excess of the repurchase price over the net proceeds of liquidation.

15.     TMHL owned the loans before they were transferred to the Trust. TMHL acquired the loans that were originated by Countrywide in two ways, one direct sale and one indirect sale.

16.     114 loans originated by Countrywide with original principal balances greater than $2 million were sold directly to TMHL under a Mortgage Loan Purchase and Servicing Agreement dated September 1, 2005, between Countrywide Home Loans, Inc. and TMHL (the **Thornburg MLPSA**). A true copy of the Thornburg MLPSA is attached to this Amended Complaint as Exhibit 2.

17.     The remaining 1,156 loans originated by Countrywide, all with original principal balances of less than $2 million, were not sold directly to TMHL by Countrywide. Countrywide sold those loans to Greenwich Capital Financial Products, Inc. (referred to as **Greenwich**) under a Master Mortgage Loan Purchase and Servicing Agreement dated April 1, 2003, between Countrywide Home Loans, Inc. and Greenwich (the **Greenwich MLPSA**). A true copy of the Greenwich MLPSA is attached to this Amended Complaint as Exhibit 3.

18.     In June 2006, Greenwich and TMHL entered into an Assignment Assumption and Recognition Agreement (the **Assignment Agreement**), which was acknowledged by Countrywide. Under Section 1 of the Assignment Agreement, TMHL assumed the rights that Greenwich had under the Greenwich MLPSA, for the loans that were ultimately transferred to the Trust. Among the rights that were assigned was the right to enforce remedies for breaches of the representations and warranties that Countrywide made about the loans.

19.     LaSalle Bank N.A. (referred to as **LaSalle**) was appointed trustee and custodian for the Trust. LaSalle was succeeded by Bank of America after Bank of America's acquisition of LaSalle on October 1, 2007. U.S. Bank N.A. (referred to as **U.S. Bank**) became successor trustee on March 31, 2009, and it remains in that role. On July 31, 2009, U.S. Bank filed Proof of Claim

No. 664 against TMHL, asserting potential claims on behalf of the Trust against TMHL arising from potential breaches of representations and warranties made by TMHL in the PSA and in the June 1, 2006 Mortgage Loan Purchase Agreement between TMHL and Greenwich Capital Acceptance, Inc., and from potentially incomplete loan files with respect to the mortgage loans ultimately transferred to the Trust.

20.     Beginning in 2007 and up to two months before TMHL filed for bankruptcy protection, TMHL and Countrywide were discussing the repurchase by Countrywide of many of the loans in the Trust that breached representations and warranties. In connection with those discussions, TMHL obtained from Countrywide loan files for 57 loans. TMHL reviewed those loan files and determined that that Countrywide breached representations and warranties it made about those loans.

21.     TMHL wrote detailed repurchase memoranda, which described the breaches of representations and warranties and requested that Countrywide repurchase loans. Plaintiffs are informed and believe, and based thereon allege, that those repurchase memoranda were transmitted to Countrywide. Countrywide has not repurchased any of these loans.

22.     Countrywide wrote responses to some of TMHL's repurchase demand memoranda. Through those responses Countrywide refused to repurchase the loans without providing evidence to refute TMHL's allegations of breach. TMHL rebutted each of Countrywide's reasons in new memoranda and renewed its demands that Countrywide repurchase the loans. Countrywide has not repurchased any of these loans.

23.     Repurchase negotiations between TMHL and Countrywide were ongoing when TMHL filed for bankruptcy protection. Countrywide has not resumed negotiations, communicated with the Trustee, or repurchased any of the 57 loans. The Plaintiffs' review of the

57 loan files confirmed that Countrywide breached one or more representations and warranties with respect to each loan.

24.    Plaintiffs conducted an investigation into the true condition of the loans. Based on that investigation, Plaintiffs concluded that at least 233 loans breached the representations and warranties that were made about the loans. Zuni Investors informed U.S. Bank about the results of the investigation.

25.    By letter dated April 15, 2011, U.S. Bank sent a repurchase demand to TMHL and the Trustee. In that letter, U.S. Bank demanded that TMHL repurchase 233 loans that breached representations and warranties and provide loan files for the loans that were still in the Trust or that were liquidated at a loss, for which TMHL and the Trustee did not have loan files.

### THE REPRESENTATIONS AND WARRANTIES IN THE THORNBURG MLPSA

26.    In Section 3.2 of the Thornburg MLPSA, Countrywide made many representations and warranties about the loans.

27.    In Section 3.2(a), Countrywide represented and warranted that "[t]he information contained in the Mortgage Loan Schedule, Credit File and the Purchase Confirmation is complete, true and correct in all material respects."

28.    In Section 3.2(j), Countrywide also represented and warranted that "[t]he Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (i) the lien of current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording that are acceptable to mortgage lending institutions generally and specifically referred to in lender's title insurance policy delivered to the originator of the Mortgage Loan and that do not adversely affect the Appraised Value (as evidenced by an appraisal referred to in such definition) of the

Mortgaged Property, and (iii) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property."

29.    In Section 3.2(p), Countrywide also represented and warranted that "[t]he origination, servicing, and collection practices used by Countrywide with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business."

30.    In Section 3.2(t), Countrywide also represented and warranted that "[t]he Credit File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by an appraiser . . . that had no interest, direct or indirect in the Mortgaged Property, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to Fannie Mae."

31.    In Section 3.2(v), Countrywide also represented and warranted that "[n]o mortgage loan has a LTV in excess of ninety-five percent."

32.    In Section 3.2(w), Countrywide also represented and warranted that "[t]o the best of Countrywide's knowledge, the Mortgaged Property is lawfully occupied under applicable law."

33.    In Section 3.2(dd), Countrywide also represented and warranted that "[a]t origination, the Mortgagor represented that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence."

34.    In Section 3.2(ff), Countrywide also represented and warranted that "[t]here has been no fraud . . . committed by Countrywide in connection with the origination of the Mortgage Loans and, to the best of Countrywide's knowledge, no such fraud was committed on the part of the Mortgagor, any mortgagee, any appraiser, any builder or developer, or any other party

involved in the origination of the Mortgage Loan or in connection with the sale of such Mortgage Loan."

35.    Under Section 3.3(c) of the Thornburg MLPSA, Countrywide must repurchase any loans that breached the representations and warranties. The Thornburg MLPSA allows Countrywide to cure the breach of a representation or warranty; however, the breaches described in this Amended Complaint cannot be cured.

36.    The repurchase price of the loans is defined as the outstanding principal balance of the loan, plus all outstanding interest on the loan. In the case of liquidated loans, Countrywide must reimburse the Trust for the excess of the repurchase price over the net proceeds of liquidation.

37.    Section 3.3(e) of the Thornburg MLPSA provides that a cause of action for a breach of representations and warranties accrues only after a demand for repurchase is made on Countrywide.

**THE REPRESENTATIONS AND WARRANTIES IN THE GREENWICH MLPSA**

38.    In Section 7.02 of the Greenwich MLPSA, Countrywide made many representations and warranties about the loans.

39.    In Section 7.02(i), Countrywide represented and warranted that "[t]he information contained in the Mortgage Loan Schedule is complete, true and correct."

40.    In Section 7.02(ix), Countrywide represented and warranted that "[t]he Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in lender's title

insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value of the Mortgaged Property, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property."

41.    In Section 7.02(xx), Countrywide represented and warranted that "[t]he origination and collection practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business."

42.    In Section 7.02(xxiii), Countrywide represented and warranted that "[t]he Mortgage Loan was underwritten generally in accordance with the Seller's underwriting standards in effect at the time the Mortgage Loan was originated or acquired and the underwriting guidelines described in the related Purchase Price and Terms Letter."

43.    In Section 7.02(xxv), Countrywide represented and warranted that "[t]he Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan Application by an appraiser . . . who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to FNMA or FHLMC . . . ."

44.    In Section 7.02(xxxi), Countrywide represented and warranted that "[n]o Mortgage Loan has a Loan-to-Value Ratio at origination in excess of 95% or as otherwise set forth in the related Purchase Price and Terms Letter."

45.    In Section 7.02(xliii), Countrywide represented and warranted that "[n]o fraud was committed by the Seller in connection with the origination or servicing of the Mortgage Loan and to the best of the Seller's knowledge, no fraud was committed with respect to the Mortgage Loan on the part of the Mortgagor or any other person involved in the origination of the Mortgage Loan."

46.    Under Section 7.03 of the Greenwich MLPSA, Countrywide must repurchase any loans that breached the representations and warranties. The Greenwich MLPSA allows Countrywide to cure the breach of a representation or warranty; however, the breaches described in this Amended Complaint cannot be cured.

47.    The repurchase price of the loans is defined as the outstanding principal balance of the loan, plus all outstanding interest on the loan. In the case of liquidated loans, Countrywide must reimburse the Trust for the excess of the repurchase price over the net proceeds of liquidation.

48.    Section 7.03 of the Greenwich MLPSA provides that a cause of action for a breach of representations and warranties accrues only after a demand for repurchase is made on Countrywide.

### THE INVESTIGATION OF THE MORTGAGE LOANS

49.    Because many of the mortgage loans in the Trust have been liquidated at a loss to the Trust, are in default, or are delinquent, Plaintiffs conducted an investigation to determine whether the loans were accurately described when they were sold to TMHL. This investigation demonstrated that many of the loans breached the representations and warranties that Countrywide made about them.

50.    Plaintiffs investigated the loans in three ways. First, TMHL had loan files for 57 of the loans in the Trust. Plaintiffs engaged a loan review firm to forensically underwrite the files

(referred to as the **Forensic Underwriter**). That review showed that Countrywide breached representations and warranties about every one of those 57 loans.

51.    Because Plaintiffs did not have loan files for the other loans that were originated by Countrywide, Plaintiffs used data provided by CoreLogic, the leading provider of data about real property and mortgage loans, to investigate the true condition of the remaining loans. Based on the results of this investigation, at least 170 of the remaining 298 loans that either were liquidated at a loss to the Trust or remain in the Trust breached representations and warranties that were made about them.

52.    Finally, Plaintiffs reviewed the mortgage loan schedule attached to the PSA for the Trust and found breaches of representations and warranties for six additional loans.

## I.    Evidence of Breaches Based on Review of Loan Files by the Forensic Underwriters

53.    The Forensic Underwriter's review of the 57 loan files in TMHL's possession showed that all 57 of the loans breached representations and warranties that Countrywide made about them. 18 of the loans sold under the Thornburg MLPSA were reviewed by the Forensic Underwriter; 39 of the loans sold under the Greenwich MLPSA were reviewed by the Forensic Underwriter.

54.    For example, loan number 18834184 had a principal balance at origination of $2.8 million. The current principal balance of that loan has ballooned to more than $3.1 million through negative amortization. The review of the loan file showed that the loan breached the following representations and warranties, among others:

- *No appraisal:* Countrywide represented and warranted that the property had been appraised by an independent appraiser and that the appraisal was in a form acceptable to Fannie Mae and Freddie Mac. The loan file shows that the borrower requested a specific appraiser, which is not permitted under Fannie Mae and Freddie Mac standards. The appraisal of the property in the loan file was contingent on improvements, including an all-weather riding arena, paddocks, and a grand prix field. Current housing

listings and Plaintiffs' investigation show that those improvements were never completed, and so the appraisal was not accurate or complete. The loan file notes that a complete appraisal was never received for the property.

- *Inappropriate valuation:* Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. The property was conditionally appraised for $4.8 million. Nine months before the loan was originated, the property sold for $500,000. A Countrywide employee noted in the loan file that, if the conditional appraisal was used, the property had appreciated 860% in nine months. If a property has been sold in the 12 months prior to a loan being originated it is customary to use the lower of the sale price or the appraised value as the value of the property. Because this was not done, the loan was not originated in a customary manner.

- *Poor ability to repay:* Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. However, the Countrywide underwriting system described the borrower's ability to pay as "questionable" and "poor" and stated that her debt-to-income ratios of 48.4% and 57.7 % were too high and exceeded the limits in the underwriting guidelines. The borrower's credit report showed late payments and numerous credit inquiries in the months before the loan was originated. Because of the high risk that the borrower would default, as she eventually did, the loan was not underwritten in a prudent way.

- *Failure to follow underwriting standards:* Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. Under Countrywide's underwriting guidelines in effect at the time the loan was originated, the maximum loan amount for a reduced documentation loan like this one was $1.5 million; however, this loan was for $2.8 million. Thus, this loan was not underwritten in a prudent way.

- *No manager approval:* Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. A Countrywide employee noted in the loan file that a manager needed to sign off on the loan before it was funded, but there is nothing in the loan file that shows that a manager ever signed off on the loan. In the loan file, Countrywide employees note that the borrower's husband called and pressured Countrywide to close the loan within 24 hours because he and his wife were leaving the country. Countrywide acquiesced and cut corners to close the loan quickly. This failure to follow protocol shows that the loan was not underwritten in a prudent way.

14

- *Uninhabitable property:* Countrywide represented and warranted that the property was "lawfully occupied" and that the borrower would occupy the property as her primary residence. However, house listings for the property show that the interior fixtures in the property were never completed and thus the property was never fit to be occupied.

- *Fraudulent borrower income:* Countrywide represented that there was no fraud in connection with the origination of the mortgage loan. However, the initial application for the loan shows the borrower's monthly income as $49,000 while the final application for the loan shows her monthly income as $84,000. This difference is not explained and strongly suggests that the borrower's stated income was fraudulent and that Countrywide made no reasonable inquiry to verify the borrower's income.

55.    On or about July 23, 2007, TMHL demanded that Countrywide repurchase loan number 18834184 and wrote a detailed memorandum that included many of Countrywide's breaches of representations and warranties described above. After two rounds of responses by Countrywide and rebuttals by TMHL, Countrywide still had not repurchased loan number 18834184. TMHL's repurchase request for loan number 18834184, which was renewed in the April 15, 2011 letter, is still outstanding.

56.    Loan number 18834184 is only one example. The Forensic Underwriter found breaches of representations and warranties made by Countrywide in each of the 57 files that it examined.

57.    For instance, on loan number 18819474, the Forensic Underwriter found, among other things, that the borrower's stated monthly income of $39,000 was unreasonable, given that the borrower's highest credit limit was $13,500; the loan did not meet the underwriting guidelines then in effect because Countrywide made unwarranted exceptions to its underwriting guidelines; and the loan, which had a principal balance of $2.25 million and an LTV of 72.5%, exceeded the maximum principal balance and LTV for a reduced documentation loan. Each of the findings by the Forensic Underwriter is proof that the loan was not underwritten in a legal, proper, prudent, and customary way. Plaintiffs are informed and believe, and based thereon allege, that TMHL

requested that Countrywide repurchase loan number 18819474. Countrywide has not repurchased loan number 18819474.

58.    On loan number 18796060, the Forensic Underwriter found, among other things, that the appraised value was not supported by the comparable sales prices that were used to determine that value; the borrower's stated monthly income of $45,000 was unreasonable, given that there was no record of the borrower's business; and there were insufficient assets to close the loan. Each of the findings by the Forensic Underwriter is proof that the loan was not underwritten in a legal, proper, prudent, and customary way. TMHL wrote a detailed memorandum that described many of the breaches of representations and warranties for loan number 18796060. Plaintiffs are informed and believe, and based thereon allege, that TMHL requested that Countrywide repurchase loan number 18796060. Countrywide has not repurchased loan number 18796060.

59.    Each loan reviewed by the Forensic Underwriter breached the representations and warranties in the Thornburg MLPSA or the Greenwich MLPSA.

60.    Exhibit 4 summarizes the results of the loan file review for each of the 57 loan files. Because each loan breached the representations and warranties, Countrywide must repurchase each one.

## II.    Evidence of Breaches Based on CoreLogic Data

61.    The review by the Forensic Underwriter of the 57 loan files to which Plaintiffs have access showed that those loans breached the representations and warranties. Because Plaintiffs did not have access to loan files for the other loans that were originated by Countrywide, they used data provided by CoreLogic, the leading provider of data about real property and mortgage loans, to investigate the true condition of the loans.

62.     The investigation focused on three main aspects of the mortgage loans: the accuracy of the appraised values and loan-to-value ratios (**LTVs**) of the loans as stated in the Mortgage Loan Schedules to the Thornburg MLPSA and the Greenwich MLPSA, the existence of additional liens on the properties, and the accuracy of statements about owner-occupancy of the properties that secured the loans. There were four parts to the investigation: (i) use of a retroactive automated valuation model (**AVM**) on the properties that secured the loans; (ii) research of public records for liens on those properties; (iii) analysis of the property tax records for the properties; and (iv) analysis of addresses in the credit bureau files of the borrowers.

**A.      Breach of Representations and Warranties about the Mortgage Loan Schedule**

63.     In Section 3.2(a) of the Thornburg MLPSA, Countrywide represented and warranted that the "[t]he information contained in the Mortgage Loan Schedule, the Credit File and the Purchase Confirmation is complete, true and correct in all material respects." The Schedule describes, among other things, the LTV at origination of the loan and the occupancy status of the property.

64.     In Section 7.02(i) of the Greenwich MLPSA, Countrywide represented and warranted that "[t]he information contained in the Mortgage Loan Schedule is complete, true and correct." The Schedule describes, among other things, the LTV at origination of the loan and the occupancy status of the property.

**1.      LTV**

65.     LTV is the ratio of the amount of money borrowed by the borrower to the value of the property mortgaged to provide security to the lender. For example, if a borrower borrowed $300,000 and gave a mortgage on property valued at $500,000, then the LTV would be 60%.

66.     LTV is one of the most crucial measures of the risk of a mortgage loan. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also determines the severity of losses for those loans that do default. The lower the LTV, the lower the severity of losses on those loans that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

67.     For each of these reasons, an LTV that is reported as lower than its true value materially and adversely affects the value of that mortgage loan.

68.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, if the denominator is too high, then the risk of the loan will be understated, sometimes greatly understated. To use the example in paragraph 65, if the property's actual value is $500,000, but it is incorrectly valued at $550,000, then the ostensible LTV of the loan would be 54.5%, not 60%, and thus the loan appears less risky than it actually is.

69.     Using a comprehensive, industry-standard AVM, Plaintiffs determined the true market value of many of the properties that secured loans sold under the Thornburg MLPSA and the Greenwich MLPSA, as of the origination date of each loan. An AVM considers objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM used by Plaintiffs incorporates a database of 500 million sales covering zip codes that represent

more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

70.    There was sufficient information to determine the value of 613 of the 1,270 properties that secured loans in the trust originated by Countrywide, and thereby to calculate the correct LTV of each of those loans as of the date on which each loan was made. On 265 of those 613 properties, the AVM reported that the appraised value in the Mortgage Loan Schedule was 105% or more of the true market value as determined by the model, and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $45,264,027. The AVM reported that the appraised value in the Mortgage Loan Schedule was 95% or less of the true market value on only 151 properties, and the amount by which the true market values of those properties exceeded the reported values was $11,678,485. Thus, the number of properties on which the value was overstated was nearly twice the number on which the value was understated, and the aggregate amount overstated was nearly four times the aggregate amount understated.

71.    For the loans that were liquidated at a loss or that still remain in the Trust, there are 67 loans that were appraised for more than 105% of the value that was stated in the Schedule. Details of the AVM results for each loan on which the appraised value was more than 105% of the value determined by the model are given in Table 1 of Exhibit 5.

72.    Seven of the 67 loans were sold under the Thornburg MLPSA. Each of those loans breached the representation and warranty in Section 3.02(a) of the Thornburg MLPSA. Sixty of the 67 loans were sold under the Greenwich MLPSA. Each of those loans breached the representation and warranty in Section 7.02(i) of the Greenwich MLPSA.

### 2.    Occupancy Status

73.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and are therefore less risky.

74.    Occupancy status (that is, whether the property that secures the mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important factor in determining the risk of a mortgage loan. Other things being equal, if a loan is secured by an investment property or a second home, the greater the risk of the loan. A representation that the property that secured a mortgage loan was owner occupied when the property was actually not owner occupied materially and adversely affects the value of that loan.

75.    In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead.

76.    The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to 60 of the properties that were stated in the Schedules to the MLPSAs to be owner occupied, the owner could have but did not designate the property as his or her homestead. These 60 loans are identified in Table 2 of Exhibit 5.

77.    For 44 properties that secured the mortgage loans, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself, even though the property was reported to be owner occupied in the Schedule. Such an instruction is strong evidence that the borrower did not live in the mortgaged property or

consider it to be his or her primary residence. These 44 loans are identified in Table 2 of Exhibit 5.

78.    When a borrower actually occupies a newly mortgaged property, it is virtually certain that some of the entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) will begin sending bills to the address of the newly mortgaged property. If the borrower is not receiving any bills at the mortgaged property six months after the closing of the mortgage, then it is very likely that the borrower does not occupy the mortgaged property. For the properties that secured loans in the Trust, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit files to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Twenty-three borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be primary residences did not receive any bills at the address of the mortgaged property but did receive their bills at an address or addresses that were different from the address of the mortgaged properties. It is very likely that each of these borrowers did not occupy the mortgaged property. These 23 loans are identified in Table 2 of Exhibit 5.

79.    With respect to 74 mortgage loans, the occupancy statuses of the properties as reflected in the mortgage loan schedules were incorrect. With respect to 60 mortgage loans, the borrower could have designated the property as his or her homestead but did not. With respect to 44 mortgage loans that were represented to be owner occupied, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. With respect to 23 mortgage loans that were represented to be owner occupied, the borrower did not receive bills at the mortgaged property six months after the loan closed, but

did receive bills at a different address. Each of these criteria indicates that the property was not actually owner occupied.

80.     Seventeen of the 74 loans where the occupancy status was misrepresented were sold under the Thornburg MLPSA. Each such loan breached Section 3.2(a) of the Thornburg MLPSA. Fifty-seven of the 74 loans where the occupancy status was misrepresented were sold under the Greenwich MLPSA. Each such loan breached Section 7.02(i) of the Greenwich MLPSA.

### B.     Breach of Representations and Warranties about Additional Liens

81.     In Section 3.2(j) of the Thornburg MLPSA, Countrywide represented and warranted that "[t]he Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (i) the lien of current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording that are acceptable to mortgage lending institutions generally and specifically referred to in lender's title insurance policy delivered to the originator of the Mortgage Loan and that do not adversely affect the Appraised Value (as evidenced by an appraisal referred to in such definition) of the Mortgaged Property, and (iii) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property."

82.     In Section 7.02(ix) of the Greenwich MLPSA, Countrywide represented and warranted that "[t]he Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and

restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised of the Mortgaged Property, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property."

83.     For 96 mortgage loans, the investigation revealed that the properties also secured other liens. Each additional lien was a lien that could materially interfere with the benefits of the security intended to be provided by the mortgage or the use, enjoyment, value or marketability of the mortgaged property. These 96 loans are identified in Table 3 of Exhibit 5.

84.     Sixteen of the 96 mortgage loans with additional liens were sold under the Thornburg MLPSA. Each mortgage loan with an additional lien breached Section 3.2(j) of the Thornburg MLPSA. Eighty of the 96 mortgage loans with additional liens were sold under the Greenwich MLPSA. Each mortgage loan with an additional lien breached Section 7.02(ix) of the Greenwich MLPSA.

   **C.     Breach of Representations and Warranties about Underwriting and
           Appraisal Practices of Countrywide**

85.     In Section 3.2(p) of the Thornburg MLPSA, Countrywide represented and warranted that "[t]he origination, servicing, and collection practices used by Countrywide with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent, and customary in the mortgage origination and servicing business."

86.     In Section 3.2(t) of the Thornburg MLPSA, Countrywide also represented and warranted that "[t]he Credit File contains an appraisal of the related Mortgaged Property signed

prior to the approval of the Mortgage Loan application by an appraiser who meets the minimum requisite qualifications of Fannie Mae for appraisers, duly appointed by the originator, that had no interest, direct or indirect in the Mortgaged Property, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to Fannie Mae."

87.   In Section 7.02(xx) of the Greenwich MLPSA, Countrywide represented and warranted that "[t]he origination and collection practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business."

88.   In Section 7.02(xxiii) of the Greenwich MLPSA, Countrywide represented and warranted that "[t]he Mortgage Loan was underwritten generally in accordance with the Seller's underwriting standards in effect at the time the Mortgage Loan was originated or acquired and the underwriting guidelines described in the related Purchase Price and Terms Letter."

89.   In Section 7.02(xxv) of the Greenwich MLPSA, Countrywide represented and warranted that "[t]he Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan Application by an appraiser . . . who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to FNMA or FHLMC . . . ."

90.   Originators of mortgage loans have written standards for the underwriting of loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are

made only to borrowers with credit standing and financial resources sufficient to repay the loans and only against collateral with value, condition, and marketability sufficient to secure the loans.

91.     Underwriting guidelines usually contain requirements that the property that secures the loan be appraised by an independent appraiser. A representation that a loan was secured by a property appraised by an independent appraiser when the loan was secured by a property appraised by an appraiser who was not independent materially and adversely affects the value of that mortgage loan.

92.     As reported in the 2007 National Appraisal Survey conducted by October Research, around the time of this securitization, brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraised value was not high enough to enable the transaction to close and sometimes by refusing to pay for completed appraisals that were not high enough. This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values;

- the withholding of business if the appraisers refused to guarantee a predetermined value;

- the withholding of business if the appraisers refused to ignore deficiencies in the property;

- the refusal to pay for an appraisal that did not give the brokers and loans officers the property values that they wanted; and

- the black listing of honest appraisers in order to use "rubber stamp" appraisers.

93.     Appraisals made under pressure of this kind are not conducted in a proper or prudent manner, do not conform to Fannie Mae and Freddie Mac appraisal standards, and do not conform to the underwriting guidelines.

94.     As described above, the number of properties on which the value was overstated was nearly twice the number on which the value was understated, and the aggregate amount

overstated was nearly four times the aggregate amount understated. This lopsided result demonstrates the upward bias in appraisals of properties that secured the mortgage loans in the Trust.

95.    For the 67 mortgage loans where the AVM reported a value significantly lower than the reported appraised value there is strong evidence that the appraisal was biased because the appraisers were not independent. Seven of those 67 mortgage loans were sold under the Thornburg MLPSA. Each such loan breached the representations and warranties in Sections 3.2(p) and 3.2(t) of the Thornburg MLPSA. Sixty of those 67 mortgage loans were sold under the Greenwich MLPSA. Each such loan breached the representations and warranties in Sections 7.02(xx), 7.02(xxiii), and 7.02(xxv) of the Greenwich MLPSA.

    **D.    Breach of Representations and Warranties about the Maximum LTV of the Loans**

96.    In Section 3.2(v) of the Thornburg MLPSA, Countrywide represented and warranted that "[n]o Mortgage Loan had an LTV in excess of 95.00%."

97.    In Section 7.02(xxxi) of the Greenwich MLPSA, Countrywide represented and warranted that "[n]o Mortgage Loan has a Loan-to-Value Ratio at origination in excess of 95% or as otherwise set forth in the related Purchase Price and Terms Letter."

98.    For many of the mortgage loans, the value determined by the AVM was significantly lower than the reported value of the property, so the actual LTV was higher than the reported LTV because the denominator used to calculate the reported LTV was higher than the true denominator. For 24 mortgage loans, using the true value of the property as determined by the AVM, the actual LTV was more than 95%.

99.    Five of the 24 mortgage loans with LTVs greater than 95% were sold under the Thornburg MLPSA. Each mortgage loan with an actual LTV of more than 95% breached Section

3.2(v) of the Thornburg MLPSA. Nineteen of the 24 mortgage loans with LTVs greater than 95% were sold under the Greenwich MLPSA. Each mortgage loan with an actual LTV of more than 95% breached Section 7.02(xxxi) of the Greenwich MLPSA.

**E.    Breach of Representations and Warranties about Fraud**

100.    In Section 3.2(ff) of the Thornburg MLPSA, Countrywide represented and warranted that "[t]here has been no fraud that has been committed by Countrywide in connection with the origination of the Mortgage Loans and, to the best of Countrywide's knowledge, no such fraud was committed on the part of the Mortgagor, any mortgagee, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in connection with the sale of such Mortgage Loan."

101.    In Section 7.02(xliii) of the Countrywide MLPSA, Countrywide represented and warranted that "[n]o fraud was committed by the Seller in connection with the origination or servicing of the Mortgage Loan and to the best of the Seller's knowledge, no fraud was committed with respect to the Mortgage Loan on the part of the Mortgagor or any other person involved in the origination of the Mortgage Loan."

102.    Each of the 67 loans that had a biased appraisal was obtained through appraisal fraud, which could have been detected by Countrywide; each of the 74 loans where the occupancy status was misrepresented was obtained through occupancy fraud, which could have been detected by Countrywide. Eliminating duplicates, 121 loans were obtained through fraud that could have been detected by Countrywide.

103.    Twenty-one of the 121 loans were sold under the Thornburg MLPSA. Each such loan breached the representations and warranties in Section 3.2(ff) of the Thornburg MLPSA. One-hundred of the 121 loans were sold under the Greenwich MLPSA. Each such loan breached the representations and warranties in Section 7.02(xliii) of the Greenwich MLPSA.

### F.    Example Loans that Breached the Representations and Warranties

104.    Loan number 18796193 was sold under the Thornburg MLPSA. This loan for $2.42 million was secured by a property that had a reported appraised value of $3.45 million. The AVM determined that the true value of the property was $2.41 million. Thus the reported LTV was 70%, but the true LTV was 100%. The property was reported to be owner occupied but the borrower did not designate the property as a homestead and had tax bills sent to another address. This loan therefore breached the following representations and warranties: Section 3.2(a), (p), (t), (v), and (ff).

105.    Loan number 18824631 was sold under the Greenwich MLPSA. This loan for $520,000 was secured by a property that had a reported appraised value of $650,000. The AVM determined that the true value of the property was $483,000. Thus the reported LTV was 80%, but the true LTV was 108 %. The property was reported to be owner occupied but the borrower did not receive bills at the address of the mortgaged property, but did receive bills at a different address, did not designate the property as a homestead, and had the tax bills sent to another address. The property also secured an additional lien of $65,000. This loan therefore breached the following representations and warranties: 7.02(i), (ix), (xx), (xxiii), (xxv), (xxxi), and (xliii).

106.    A list of each of the loans that the review of CoreLogic data uncovered that breached the representations and warranties is attached as in Exhibit 6.

### III.    Breaches of Representations and Warranties based on the Zuni Trust Mortgage Loan Schedule

107.    In Section 3.2(dd) of the Thornburg MLPSA, Countrywide represented and warranted that "[a]t origination, the Mortgagor represented that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence."

108.   The Mortgage Loan Schedule for the Pooling and Servicing Agreement states that 11 of the loans that were sold under the Thornburg MLPSA were represented to be either investment properties or second homes at origination. These 11 loans are listed in Table 4 of Exhibit 5.

109.   Each such loan breached the representations and warranties in Section 3.2(dd).

110.   Based on the results of the investigation, 53 of the loans that were sold under the Thornburg MLPSA breached the representations and warranties that Countrywide made about them. One-hundred eighty of the loans that were sold under the Greenwich MLPSA breached the representations and warranties that Countrywide made about them.

111.   Based on the 233 loans that breached the representations and warranties and on the publically available information described in paragraphs 124 through 128, Plaintiffs are informed and believe that many more loans breached the representations and warranties.

**PLAINTIFFS' NOTIFICATION OF BREACH AND DEMAND FOR REPURCHASE AND COUNTRYWIDE'S FAILURE TO RESPOND**

112.   Under section 3.3(b) of the Thornburg MLPSA, Countrywide agreed that:

> Within 90 days from the earlier of either discovery by or notice to Countrywide of a breach of a representation or warranty that materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, Countrywide shall use its best efforts to cure such breach in all material respects, and, if such breach cannot be cured, Countrywide shall, at the Purchaser's option, repurchase such loans at the Repurchase Price.

113.   Under section 7.03 of the Greenwich MLPSA, Countrywide agreed that:

> [Countrywide] shall have a period of ninety (90) days from the earlier of its discovery of a breach or the receipt by [Countrywide] of notice of such a breach within which to correct or cure such breach. [Countrywide] hereby covenants and agrees that if any such breach cannot be corrected or cured within such ninety (90) day period, [Countrywide] shall, at Purchaser's option and not later than ninety (90) days after its discovery or its receipt of notice of such breach, repurchase such Mortgage Loan at the Repurchase Price.

114.    As defendants have acknowledged, under the terms of the PSA, U.S. Bank, as trustee of the Trust, acquired authority to enforce against Countrywide, for breaches of representations and warranties, the remedies set forth in the Thornburg MLPSA and the Greenwich MLPSA.

115.    By agreement dated June 8, 2011, U.S. Bank, as trustee of the Trust, transferred to the Plaintiffs, for the benefit of the Trust, authority to exercise any and all rights and remedies that U.S. Bank has or may have under the PSA, including, but not limited to, the right to compel Countrywide to repurchase loans that are in breach of representations and warranties that are set forth or referenced in the PSA. A true copy of the June 8, 2011 agreement is attached to this Amended Complaint as Exhibit 7.

116.    By their correspondence dated April 15, 2011, the Plaintiffs notified Countrywide of the representations and warranties it had breached with respect to 233 loans in the Trust.

117.    The April 15 correspondence renewed demands that Countrywide repurchase loans that TMHL had already requested that Countrywide repurchase and demanded that Countrywide comply with the provisions of the Greenwich MLPSA and the Thornburg MLPSA by repurchasing additional loans that breached the representations and warranties.

118.    To the date of this filing, Countrywide has not responded to the April 15 correspondence, much less taken any steps to repurchase the loans or otherwise cure Countrywide's breaches of the Greenwich MLPSA or the Thornburg MLPSA.

119.    By correspondence dated July 26, 2011, over 90 days after transmission of the April 15 letter, the Plaintiffs reiterated their demand that Countrywide comply with relevant provisions of the Thornburg MLPSA and the Greenwich MLPSA. Countrywide has not complied. A true copy of the July 26, 2011 letter is attached to this Amended Complaint as Exhibit 8.

## PLAINTIFFS' REQUEST FOR LOAN FILES

120.    Under Sections 4.1 and 5.6 of the Thornburg MLPSA, TMHL and the Trust have the right to access the documents in Countrywide's possession that relate to the mortgage loans, including the loan files created at origination.

121.    Under Section 6.02 of the Greenwich MLPSA and the Assignment Agreement, TMHL and the Trust have the right to access the Servicing Files for the loans. The definition of Servicing Files includes the loan files created at origination.

122.    Based on the evidence described above and the additional evidence described in paragraphs 124 through 128, Plaintiffs believe many more loans breached the representations and warranties that Countrywide made about them.

123.    In addition to the evidence from the loans that Plaintiffs have investigated, cited above, there is strong evidence from governmental investigations that Countrywide made extensive, undisclosed departures from its stated underwriting standards.

124.    The Securities and Exchange Commission conducted an extensive investigation of the lending practices of Countrywide. Based on the findings of its investigation, the SEC sued three former senior officers of Countrywide. In its complaint, the SEC alleged that these three senior officers committed securities fraud by hiding from investors "the high percentage of loans [Countrywide] originated that were outside its already widened underwriting guidelines due to loans made as exceptions to guidelines."

125.    The Attorneys General of many states also investigated Countrywide's lending practices. Among these, the Attorney General of California found, and alleged in a suit against Countrywide, that Countrywide "viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them." The Attorneys General of several other states also reached the same conclusion.

- The Attorney General of Washington alleged that "[t]o increase market share, [Countrywide] dispensed with many standard underwriting guidelines . . . to place unqualified borrowers in loans which ultimately they could not afford."

- The Attorney General of Illinois alleged in a suit against Countrywide that Countrywide was "indifferen[t] to whether homeowners could afford its loans."

- The Attorney General of West Virginia alleged that "Countrywide sold West Virginia consumers loans when there was no reasonable probability of the consumers being able to pay the loan in full."

126.   Countrywide did not adhere to its own underwriting standards, but instead abandoned or ignored them. According to internal Countrywide documents recently made public by the SEC, Angelo Mozilo, the former CEO of Countrywide, admitted that loans "had been originated 'through our channels with disregard for process [and] compliance with guidelines.'" Similarly, the Attorney General of California alleged that "Countrywide did whatever it took to sell more loans, faster – including by . . . disregarding the minimal underwriting criteria it claimed to require."

127.   Countrywide made exceptions to its underwriting standards where no compensating factors existed, resulting in higher rates of default. According to the SEC in its action against former officers of Countrywide:

> [T]he actual underwriting of exceptions was severely compromised. According to Countrywide's official underwriting guidelines, exceptions were only proper where "compensating factors" were identified which offset the risks caused by the loan being outside of guidelines. In practice, however, **Countrywide used as "compensating factors" variables such as FICO and loan to value, which had already been assessed [in determining the loan to be outside of guidelines].**

(Emphasis in original.) Such "compensating factors" did not actually compensate for anything and did not "offset" any risk.

128.    Finally, Countrywide did not apply its underwriting standards in accordance with all federal, state, and local laws. Countrywide has entered into agreements to settle charges of violation of predatory lending, unfair competition, false advertising, and banking laws with the Attorneys General of at least 39 states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Attorneys General of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing.

\*

129.    This additional evidence shows that many of the loans already identified did not conform to Countrywide's underwriting standards, and that many more of the 1,270 loans sold under the Thornburg MLPSA and the Greenwich MLPSA likely breached representations and warranties that Countrywide made about the loans. In particular, based on this evidence, many more loans likely breached the representations and warranties in the MLPSAs that the loans were underwritten in a legal, proper, prudent, and customary manner.

130.   Plaintiffs therefore wish to obtain the loan files that they are entitled to under Sections 4.1 and 5.6 of the Thornburg MLPSA and Section 6.02 of the Greenwich MLPSA.

**COUNTRYWIDE'S FAILURE TO NEGOTIATE OR MEDIATE WITH PLAINTIFFS**

131.   In March 2009, after the merger between Bank of America and Countrywide, TMHL and Countrywide settled a repurchase dispute arising out of a demand by TMHL that Countrywide repurchase four loans.[2] In the settlement agreement, Countrywide and TMHL agreed to mediate disputes about repurchase demands arising out of, *inter alia*, the Thornburg MLPSA. By its terms, the agreement to mediate does not apply to repurchase demands pursuant to the Greenwich MLPSA. Section 10 of the Settlement Agreement states in part:

> *Mandatory Mediation of Other Existing or Future Claims.* In the event that a dispute arises between the Parties with respect to one or more mortgage loan repurchase demands under the [Thornburg MLPSA] and the dispute is not resolved by regular business negotiations between the Parties, then the Parties each agree to submit the dispute to at least one hour of non-binding mediation per mortgage loan that is subject to the mediation. . . . If any party commences an arbitration or court action based on a dispute or claim to which this Section applies without first attempting to resolve the matter through mediation as set forth in this Section 10, that Party thereby waives any right to indemnification for, or recovery of, attorneys' fees and costs that it might otherwise have under the [Thornburg MLPSA].

132.   In addition to providing notice of the representations and warranties Countrywide breached and demanding performance by Countrywide, in their letter dated April 15, 2011, Plaintiffs requested that Countrywide engage in mediation as contemplated under the Settlement Agreement. Plaintiffs also requested that while mediation was ongoing, Countrywide enter into a tolling agreement to toll any applicable statute of limitations that might potentially run. The April

---

[2] None of the four loans that were the subject of that repurchase dispute are the subject of this Amended Complaint. Although one such loan was in the Zuni Trust, the settlement granted full indemnity for any losses suffered by the Zuni Trust with respect to that loan.

15 letter stated that if Countrywide did not agree to this proposal by April 28, 2011, Plaintiffs would conclude that Countrywide had refused to mediate. Countrywide did not respond.

133.    TMHL was and is prepared to mediate as contemplated by the Settlement Agreement. Countrywide has refused to mediate. Although Zuni Investors is not bound by the Settlement Agreement, Zuni Investors will agree to participate in a mediation so long as its litigation position is not prejudiced.

134.    Countrywide did not respond at all to Plaintiffs' letter of April 15. Countrywide has not repurchased any of the loans that are the subject of this repurchase demand. Countrywide has not agreed to enter into a tolling agreement with Plaintiffs. Countrywide has not consented to mediate any disputes about the loans which Plaintiffs demand that Countrywide repurchase. Countrywide has not provided Plaintiffs with access to any additional loan files. Indeed, Countrywide has not communicated about or sought to discuss any of these matters with the Trustee since THML filed its petition under Chapter 11.

**LIABILITY OF DEFENDANT BANK OF AMERICA CORPORATION
AND ITS SUBSIDIARIES AS SUCCESSORS TO COUNTRYWIDE FINANCIAL
CORPORATION AND COUNTRYWIDE**

135.    BAC and/or certain of its subsidiaries are liable for the claims asserted herein as successors to Countrywide, Countrywide Financial Corporation and/or other Countrywide entities.

136.    BAC and Bank of America have engaged in an elaborate corporate shell game intended to pull the assets of Countrywide, Countrywide Financial Corporation and/or other Countrywide entities into the operating companies of Bank of America while leaving the liabilities of those entities in moribund companies that have no operations or assets. The full extent of the machinations of BAC and Bank of America in furtherance of this scheme is not

known because of the sparse public disclosures regarding the transactions undertaken to accomplish the scheme.

137.    At all relevant times, BAC was a public company whose stock was traded on the New York Stock Exchange.

138.    Before the merger with BAC described below, Countrywide Financial Corporation (referred to as **Old CFC**) was the publicly-traded parent of numerous subsidiaries, including Countrywide.

139.    On January 11, 2008, BAC and Old CFC entered into an Agreement and Plan of Merger (referred to as the **Merger Agreement**) pursuant to which Old CFC would be merged into Red Oak Merger Corporation, a wholly-owned subsidiary of BAC formed to accomplish the merger.

140.    Under the Merger Agreement, Old CFC would merge into Red Oak and cease to exist, and Red Oak would continue as the surviving company.

141.    Under the Merger Agreement, the shareholders of Old CFC would receive, and ultimately did receive, 0.1822 shares of BAC stock for each share of Old CFC, thereby maintaining those shareholders' ownership interest in the businesses of Old CFC.

142.    After the merger, Red Oak was to be renamed Countrywide Financial LLC but was in fact renamed Countrywide Financial Corporation (referred to as **New CFC**), the same name as that of the publicly-traded Countrywide entity (Old CFC) that ceased to exist upon completion of the merger.

143.    In a Form 8-K filing also dated January 11, 2008, BAC disclosed that the Merger Agreement was between Old CFC and BAC, the public company, not any subsidiary or affiliate of BAC.

144.    In a press release accompanying the 8-K, BAC stated that it intended initially to operate Countrywide separately under the Countrywide brand and that integration of Countrywide's operations with the operations of Bank of America would occur in 2009.

145.    On February 22, 2008, an article appeared in the periodical *Corporate Counsel* about the litigation that Countrywide then faced and its possible implications for Bank of America. In the article, a spokesperson for Bank of America acknowledged that Bank of America had "bought the company and all of its assets and liabilities[,] . . . was aware of the claims and potential claims against the company and [had] factored these into the purchase."

146.    On May 28, 2008, BAC filed a Form 8-K and issued a press release stating that Bank of America was creating a new banking management structure and that a long-time Bank of America officer, Barbara Desoer, would become president of the new consumer real estate operations of "Countrywide Financial Corporation and Bank of America when they are combined." The press release also stated that Desoer would be based in Calabasas, California, the location of Old CFC's principal offices.

147.    BAC and Old CFC consummated the merger on July 1, 2008. As a result, Old CFC ceased to exist. By operation of law, as a consequence of the merger, Red Oak (soon thereafter renamed Countrywide Financial Corporation, which is New CFC) assumed the liabilities of Old CFC. In a July 1, 2008 8-K and press release, the president of Bank of America's consumer real estate unit (Deseor) stated that it was now time to "begin to combine the two companies and prepare to introduce our new name and way of operating." The release also noted that the combined entity would be based in Calabasas, California, the former principal offices of Countrywide. Plaintiffs are informed and believe, and based thereon allege, that Bank of America's consumer real estate unit has been and remains housed in the offices formerly occupied

by Countrywide and that Bank of America has retained a substantial number of former employees of Countrywide to operate its consumer real estate unit. Indeed, in October 2008, Desoer stated that the combined company had named a mix of Bank of America and former Countrywide executives to various leadership roles.

148.    In its annual report for the fiscal year ended December 31, 2008, BAC disclosed that the fair value of the non-cash assets obtained and liabilities assumed by virtue of the Countrywide merger was $157.4 billion and $157.8 billion, respectively.

149.    Contemporaneously with the merger, BAC announced that certain Countrywide entities would sell specified assets to specific Bank of America entities. According to BAC, the consideration paid for these assets was approximately $32 billion in cash or cash equivalents. Under BAC's own disclosures, then, approximately $125 billion in non-cash assets obtained by virtue of the Countrywide merger were not conveyed pursuant to these asset sales, which were completed on or about July 3, 2008.

150.    On October 6, 2008, BAC filed an 8-K announcing, among other things, that in connection with the integration of New CFC and Countrywide into Bank of America's other businesses and operations, New CFC and Countrywide would transfer all or substantially all of their remaining assets to unnamed subsidiaries of BAC in exchange for the assumption of approximately $21 billion of Countrywide debt. In contrast to the relatively fulsome disclosures made about the merger and first round of asset sales, BAC and Bank of America offered virtually no details about these contemplated asset sales. Plaintiffs are informed and believe, and based thereon allege, that the intended effect of these transactions was to integrate those assets further into the operations of Bank of America while leaving the liabilities with New CFC and Countrywide.

151.    On November 7, 2008, BAC filed an 8-K announcing, among other things, that in connection with the integration of New CFC and Countrywide with Bank of America's other businesses and operations, New CFC and Countrywide had transferred substantially all of their assets and operations to BAC. Again, virtually no details of these transactions were disclosed. Plaintiffs are informed and believe, and based thereon allege, that, primarily as a result of this transfer of assets, New CFC and Countrywide are now moribund organizations, with few, if any, assets or operations.

152.    Plaintiffs are informed and believe, and based thereon allege, that transferees of New CFC's and Countrywide's assets may have included Bank of America companies instead of, or in addition to, BAC. Because of the sparse nature of the disclosures about these transactions, it is impossible to be certain which Bank of America entities may have been involved.

153.    As the principal consideration for New CFC's and Countrywide's assets, BAC assumed Countrywide debt securities and related guarantees in an aggregate amount of $16.6 billion. BAC assumed much of this debt through the amendment of indenture agreements substituting BAC as the issuer and/or guarantor of the securities subject to the indentures.

154.    According to defendants' own figures, then, Bank of America obtained approximately $125 billion in assets in exchange for the assumption of $16.6 billion in debt. Self-evidently, the consideration given for those assets was grossly insufficient.

155.    On April 27, 2009, Bank of America announced the rebranding of Countrywide operations as Bank of America Home Loans. Bank of America stated that the new brand would represent the combined operations of Bank of America's mortgage and home equity business and Countrywide.

156.   As of September 21, 2009, former Countrywide bank deposit accounts were assumed by Bank of America. On November 9, 2009, online account services for Countrywide mortgages were consolidated with Bank of America's Online Banking website. Countrywide's former website now links directly to the Bank of America website. *See, e.g.,* Mortgage Loan Officer Locator, http://www.home.countrywide.com (last visited July 29, 2011).

157.   By the intricate and largely undisclosed transactions described above, BAC and Bank of America appear to have moved Old CFC's and Countrywide's businesses out of Old CFC and Countrywide, combined them with their own business operations, and proceeded to operate them.

158.   Bank of America operates its combined consumer real estate unit out of what was Old CFC's and Countrywide's headquarters. The Plaintiffs are informed and believe, and based thereon allege, that Bank of America employs many former employees of Countrywide to operate this combined unit.

159.   Plaintiffs are informed and believe, and based thereon allege, that Bank of America's rebranded consumer real estate business, Bank of America Home Loans, now operates out of over 1,000 former Countrywide offices nationwide.

160.   Public statements and other actions by Old CFC and BAC reflect that the companies intended that their business operations combine and understood that Bank of America was responsible for the liabilities of Countrywide entities. In its press release announcing the merger, BAC declared that it planned to operate Countrywide separately under the Countrywide brand for a limited period only, with integration to occur in 2009. In its 2008 annual report, BAC stated that as a "combined company," Bank of America would be recognized as a responsible lender. Similarly, representatives of Old CFC stated that the "combination" of Countrywide and

Bank of America would create one of the most powerful mortgage franchises in the world. In addition, on a November 16, 2010 conference call, Brian Moynihan, the president and CEO of BAC, stated that Bank of America "would pay for the things that Countrywide did." And in a New York Times article published in December 2010, Moynihan, discussing Countrywide, was quoted as acknowleging that "our company bought it and we'll stand up; we'll clean it up."

161.    Bank of America has made a practice of taking responsibility for Countrywide liabilities. On October 6, 2008, for example, Bank of America settled lawsuits brought against Countrywide companies by state Attorneys General by agreeing to loan modifications for 390,000 borrowers, an agreement valued at over $8 billion.

162.    Further, On January 3, 2011, Bank of America paid $2.8 billion to Fannie Mae and Freddie Mac to settle claims on billions of dollars in hundreds of thousands of loans that went sour after Fannie Mae and Freddie Mac purchased them from Countrywide. In exchange for the payments, Fannie Mae and Freddie Mac agreed to drop their demands that Bank of America buy back Countrywide mortgages.

163.    And finally, in a proposed settlement of Countrywide liabilities announced on or about June 29, 2011, Bank of America has agreed to pay $8.5 billion for the benefit of investors in Countrywide trusts to resolve, among other things, claims against Countrywide for breaching representations and warranties made about the mortgage loans in the trusts and for violating prudent standards of care in servicing those loans. The release of Bank of America contemplated by this settlement expressly includes claims against Bank of America for successor liability.

164.    Because BAC and Bank of America continued to operate the businesses of Old CFC and Countrywide, they had to assume the liabilities necessary to continue those operations. Plaintiffs are informed and believe, and based thereon allege, that they did so.

165.    In general, when a corporation sells all or substantially all of its assets to another, the liabilities of the seller do not pass to the asset purchaser unless they are part of the bargained-for exchange between the parties. There are, however, a number of doctrines of successor liability that create exceptions to this general rule. BAC and/or other unnamed Bank of America companies are liable to Plaintiffs because they are the successors to the liabilities of Old CFC and Countrywide that were transferred to New CFC by virtue of the Bank of America/Countrywide merger.

**FIRST CAUSE OF ACTION:**
**BREACH OF REPRESENTATIONS AND WARRANTIES**
**IN THE THORNBURG MLPSA**

166.    Plaintiffs incorporate in this paragraph by reference, as though fully set forth, paragraphs 1 to 165.

167.    The Thornburg MLPSA is a valid contract.

168.    In the Thornburg MLPSA, and for valuable consideration, Countrywide made to TMHL representations and warranties about each of the mortgage loans that TMHL purchased from Countrywide.

169.    At least 53 of the loans that TMHL purchased through the Thornburg MLPSA breached representations and warranties that Countrywide made about those loans.

170.    Countrywide must repurchase the loans that are in breach of representations and warranties set forth in the Thornburg MLPSA. Countrywide has not repurchased the loans and has therefore breached the Thornburg MLPSA.

171.    The Trustee has the authority to enforce the right of repurchase set forth in the Thornburg MLPSA because TMHL was a party to that agreement. Further, the Trustee (on behalf of the Debtors) and Zuni Investors have the authority to enforce the same right of repurchase by

virtue of the June 8, 2011 Agreement in which U.S. Bank, as trustee to the Trust, transferred authority to the Trustee and Zuni Investors.

172.    Countrywide's failure to repurchase the loans has caused damages to the Debtors, the Trust and to the certificateholders of the Trust, including Plaintiff Zuni Investors. Countrywide is obligated to repurchase from the Trust every loan that breached representations and warranties. The value of the certificates held by Zuni Investors is impaired by Countrywide's breaches of representations and warranties and the failure of Countrywide to repurchase those loans.

173.    Under the doctrine of successor liability, BAC is liable for Countrywide's failure to repurchase the loans in the Trust that breach representations and warranties set forth in the Thornburg MLPSA.

**SECOND CAUSE OF ACTION:**
**BREACH OF SECTIONS 4.1 AND 5.6 OF THE THORNBURG MLPSA**

174.    Plaintiffs incorporate in this paragraph by reference, as though fully set forth, paragraphs 1 to 165.

175.    The Thornburg MLPSA is a valid contract.

176.    In the Thornburg MLPSA, and for valuable consideration, Countrywide agreed to provide TMHL with access to the documents in Countrywide's possession that relate to the mortgage loans. Further, under the June 8, 2011 Agreement, U.S. Bank transferred to the Trustee (on behalf of the Debtors) and Zuni Investors authority to demand access to such documents.

177.    Countrywide has not provided the Trustee or Zuni Investors with access to the mortgage loan files.

178.    Countrywide's failure to provide loan files has caused damages to the Debtors, the Trust and the certificateholders of the Trust, including Plaintiff Zuni Investors, because Plaintiffs are unable to assess whether Countrywide breached any additional representations and warranties.

179.    Under the doctrine of successor liability, BAC is liable for Countrywide's failure to provide Plaintiffs access to the requested loan files.

**THIRD CAUSE OF ACTION:**
**BREACH OF REPRESENTATIONS AND WARRANTIES**
**IN THE GREENWICH MLPSA**

180.    Plaintiffs incorporate in this paragraph by reference, as though fully set forth, paragraphs 1 to 165.

181.    The Greenwich MLPSA is a valid contract.

182.    In the Greenwich MLPSA, and for valuable consideration, Countrywide made to Greenwich representations and warranties about each of the mortgage loans that Greenwich purchased from Countrywide.

183.    At least 180 of the loans that Greenwich purchased breached representations and warranties that Countrywide made about those loans.

184.    Under the Assignment Agreement, which was acknowledged by Countrywide, TMHL purchased from Greenwich the loans sold under the Greenwich MLPSA. Greenwich also assigned its rights under the Greenwich MLPSA to TMHL.

185.    Countrywide must repurchase the loans that are in breach of representations and warranties set forth in the Greenwich MLPSA. Countrywide has not repurchased the loans and therefore has breached the Greenwich MLPSA.

186.    Under the Assignment Agreement, the Trustee has the authority to enforce the right of repurchase set forth in the Greenwich MLPSA because TMHL was a party to the Assignment Agreement. Further, the Trustee (on behalf of the Debtors) and Zuni Investors have

authority to enforce the same right of repurchase by virtue of the June 8, 2011 Agreement in which U.S. Bank, as trustee of the Trust, transferred that authority to the Trustee and Zuni Investors.

187.    Countrywide's failure to repurchase the loans has caused damages to the Debtors, the Trust and to the certificateholders of the Trust, including Plaintiff Zuni Investors. Countrywide is obligated to repurchase from the Trust every loan about which Countrywide breached representations and warranties. The value of the certificates held by Zuni Investors is impaired by Countrywide's breaches of representations and warranties and the failure of Countrywide to repurchase those loans.

188.    Under the doctrine of successor liability, BAC is liable for Countrywide's failure to repurchase the loans in the Trust that breach representations and warranties set forth in the Greenwich MLPSA.

### FOURTH CAUSE OF ACTION:
### BREACH OF SECTION 6.02 OF THE GREENWICH MLPSA

189.    Plaintiffs incorporate in this paragraph by reference, as though fully set forth, paragraphs 1 to 165.

190.    The Greenwich MLPSA is a valid contract.

191.    In the Greenwich MLPSA, and for valuable consideration, Countrywide agreed to provide Greenwich with access to the documents in Countrywide's possession that relate to the mortgage loans.

192.    Pursuant to the Assignment Agreement, TMHL purchased from Greenwich the loans sold under the Greenwich MLPSA. Under the Assignment Agreement, which was acknowledged by Countrywide, Greenwich assigned its rights under the Greenwich MLPSA to TMHL. Accordingly the Trustee is entitled to access to the documents in Countrywide's

possession that relate to the mortgage loans because TMHL was a party to the Assignment Agreement. Further, under the June 8, 2011 Agreement, U.S. Bank transferred to the Trustee (on behalf of all Debtors) and Zuni Investors authority to demand access to such documents.

193.    Countrywide has not provided the Trustee or Zuni Investors with access to the mortgage loan files.

194.    Countrywide's failure to provide loan files has caused damages to TMHL, the Trust and to the certificateholders of the Trust, including Plaintiff Zuni Investors, because Plaintiffs are unable to assess whether Countrywide breached any additional representations and warranties.

195.    Under the doctrine of successor liability, BAC is liable for Countrywide's failure to provide Plaintiffs with access to the requested loan files.

## DEMAND FOR RELIEF

Therefore, Plaintiffs demand judgment against the defendants Countrywide Home Loans, Inc. and its successor Bank of America Corporation, for specific performance of their obligation to repurchase the loans under Section 3.3(c) of the Thornburg MLPSA and Section 7.03 of the Greenwich MLPSA with respect to the loans identified in the April 15, 2011 letter and Exhibit 6 to this Amended Complaint, and with respect to all other loans sold under the Thornburg MLPSA or the Greenwich MLPSA as to which Countrywide breached one or more of their representations and warranties under the MLPSAs, or in the alternative, for damages in an amount to be determined at trial, with interest. Plaintiffs also demand judgment against Countrywide Home Loans, Inc. for specific performance of its obligation to provide access to loan files under Sections 4.1 and 5.6 of the Thornburg MLPSA and Section 6.02 of the Greenwich MLPSA. Plaintiffs further demand an award of the costs and expenses of maintaining this action, including reasonable attorneys and expert fees.

/s/ David J. Grais

David J. Grais (*pro hac vice*)
Mark B. Holton (*pro hac vice*)
Leanne M. Wilson (*pro hac vice*)
GRAIS & ELLSWORTH LLP
40 East 52nd Street
New York, New York 10022


*Attorneys for Zuni Investors, LLC*


Dated: Baltimore, Maryland
　　　July 29, 2011

/s/ Richard M. Goldberg

Richard M. Goldberg, Bar No. 00794
Daniel J. Zeller, Bar No. 28107

SHAPIRO SHER GUINOT & SANDLER, P.A.
36 S. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 385-0202

*Attorneys for Joel I. Sher*
*Chapter 11 Trustee of TMST, Inc and TMST*
*Home Loans, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 29th day of July, 2011, copies of the foregoing were served on the parties listed below by first-class mail, unless said party is a registered CM/ECF participant and the Notice of Electronic Filing indicates that notice was electronically mailed to said party.

Eric S. Namrow, Esquire
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006

Jonathan Rosenberg, Esquire
William J. Sushon, Esquire
**O'MELVENY & MYERS LLP**
7 Times Square
New York, New York  10036

Joseph F. Yenouskas, Esquire
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, D.C, 20001-4432

Brian E. Pastuszenski, Esquire
John J. Falvey, Jr., Esquire
Matthew G. Lindenbaum, Esquire
**GOODWIN PROCTER LLP**
53 State Street
Boston, Massachusetts  02109

/s/ Richard M. Goldberg
Richard M. Goldberg