# Exhibit 1

40 East 52nd Street    212 755 0100
New York, New York 10022    graisellsworth.com

GRAIS & ELLSWORTH LLP

David J. Grais
212 755 3550
dgrais@graisellsworth.com

April 15, 2011

*By Certified Mail*

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, California 91302
Attention: Celia Coulter and Michael W. Schloessmann

With copy to: General Counsel

*Repurchase of Loans in ZUNI 2006-OA1*

Dear Ms. Coulter and Mr. Schloessmann:

We write on behalf of our respective clients, holders of certificates issued by Zuni Mortgage Loan Trust 2006-OA1 (the "Trust"), and Joel I. Sher (the "Bankruptcy Trustee"), the Chapter 11 trustee of both TMST, Inc., formerly known as Thornburg Mortgage, Inc. and TMST Home Loans, Inc., formerly known as Thornburg Mortgage Home Loans, Inc., ("Thornburg" and together with the certificateholders, the "Zuni Parties"). We have investigated the true condition of many of the loans in the Trust that were originated by Countrywide Home Loans, Inc., and we have discovered that many of those loans breached the representations and warranties that Countrywide made about them. Countrywide is obliged to repurchase every loan that breached a representation or warranty. We write to renew demands made by Thornburg that Countrywide repurchase 57 of the loans and to demand that Countrywide repurchase an additional 176 loans based on our review of public records and schedules about those loans. We also demand that Countrywide provide mortgage loan files to Thornburg for all of the loans in the Trust that were originated by Countrywide so that we can study further the condition of those 176 loans that breached the representations and warranties and determine if any other loans breached the representations and warranties.

Of the 2,314 loans that were transferred to the Trust on the closing date, 1,270 were originated by Countrywide. Of those loans, 32 have been liquidated at a total loss to the Trust of $18,545,504, another 915 were liquidated with no loss to the Trust, and 323 are still in the Trust. Of the 323 loans that are still in the Trust, many are in foreclosure or are "Real Estate Owned." (A loan that is real estate owned has been foreclosed upon but not yet liquidated, and the Trust owns the property that secured the loan.) We investigated the loans in three ways. First, Thornburg had loan files for 57 of the loans in the Trust. We engaged Risk Management Group LLC, a professional loan review firm, to

Countrywide Home Loans, Inc.
April 15, 2011
Page 2

GRAIS & ELLSWORTH LLP

review the files. That review showed that Countrywide breached representations and warranties about every one of those 57 loan files. Second, for the loans for which Thornburg did not have loan files, we obtained data from CoreLogic, the leading provider of data about real property and mortgage loans. Finally, we reviewed the loan schedule for the Trust and found additional breaches of representations and warranties. Our investigation concluded that at least 176 more loans breached representations and warranties. Countrywide must pay the Zuni Parties $18,545,504 to make them whole for the losses on the 32 loans that have been liquidated at a loss[1] and must pay $180,148,503 plus unpaid interest on the mortgage loans for the 206 loans that it must repurchase out of the Trust (35 from the RMG review of loan files, 166 from the review of CoreLogic data, and five from the review of the loan schedule).

AGREEMENTS GOVERNING THE MORTGAGE LOANS

The loans in the Trust that were originated by Countrywide were sold to the Trust through two agreements. First, 114 loans with principal balances greater than $2 million were sold to Thornburg under a Mortgage Loan Purchase and Servicing Agreement dated as of September 1, 2005, between Countrywide Home Loans, Inc and Thornburg Mortgage Home Loans, Inc (the "Thornburg MLPSA"). In that agreement, Countrywide represented and warranted, among other things, that:

- "The information contained in the Mortgage Loan Schedule, the Credit File and the Purchase Confirmation is complete, true and correct in all material respects;"

- "The Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (i) the lien of current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording that are acceptable to mortgage lending institutions generally and specifically referred to in lender's title insurance policy delivered to the originator of the Mortgage Loan and that do not adversely affect the Appraised Value (as evidenced by an appraisal referred to in such definition) of the Mortgaged Property, and (iii) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;"

---

[1] The RMG review of loan files, the review of CoreLogic data, and the review of the loan schedule showed that 27 of the 32 loans that have been liquidated at a loss breached the representations and warranties. The loss on these 27 loans was $17,591,121. Because the average loss severity on the remaining five loans is 47%, it is very likely that reviewing those loan files will prove that those loans breached representations and warranties. The additional loss amount on those five loans is $1,343,913.

Countrywide Home Loans, Inc.
April 15, 2011
Page 3

GRAIS & ELLSWORTH LLP

- "The origination, servicing, and collection practices used by Countrywide with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business;"

- "The Credit File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan Application by an appraiser . . . that had no interest, direct or indirect in the Mortgaged Property, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to Fannie Mae . . . ;"

- "No mortgage loan has a LTV at origination in excess of ninety-five percent;"

- "To the best of Countrywide's knowledge, the Mortgaged Property is lawfully occupied under applicable law;"

- "At origination, the Mortgagor represented that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence;" and

- "There has been no fraud that has been committed by Countrywide in connection with the origination of the Mortgage Loans and, to the best of Countrywide's knowledge, no such fraud was committed on the part of the Mortgagor, any mortgagee, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in connection with the sale of such Mortgage Loan."

Thornburg MLPSA § 3.2. Under the terms of the Thornburg MLPSA, Countrywide must repurchase any loans that breached the terms of representations and warranties.[2] *Id.* § 3.3(c). The repurchase price is defined as the outstanding principal balance of the loan, plus all outstanding interest on the loan. In the case of liquidated loans, Countrywide must reimburse Thornburg for the excess of the repurchase price over the net proceeds of liquidation. Section 3.3(e) of the Thornburg MLPSA provides that a cause of action for a breach of representations and warranties accrues only after a demand for repurchase is made on Countrywide.

Under Sections 4.1 and 5.6 of the Thornburg MLPSA, Thornburg and the Trust have the right to access the documents in Countrywide's possession that relate to the mortgage loans, including the loan files.

---

[2] The Thornburg MLPSA allows Countrywide to cure the breach of a representation or warranty; however, the breaches described in this letter cannot be cured.

Countrywide Home Loans, Inc.
April 15, 2011
Page 4

GRAIS & ELLSWORTH LLP

The remaining 1,156 loans originated by Countrywide, those with principal balances of less than $2 million, were not sold directly to Thornburg. Instead, Countrywide sold those loans to Greenwich Capital Financial Products, Inc. under a Master Mortgage Loan Purchase and Servicing Agreement dated as of April 1, 2003, between Countrywide Home Loans, Inc. and Greenwich Capital Financial Products (Greenwich MLPSA). In that agreement, Countrywide represented and warranted that:

- "The information contained in the Mortgage Loan Schedule is complete, true and correct;"

- "The Mortgage is a valid, existing and enforceable first lien on the Mortgaged Property, including all improvements on the Mortgaged Property, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised of the Mortgaged Property, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;"

- "The origination and collection practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business;"

- "The Mortgage Loan was underwritten generally in accordance with the Seller's underwriting standards in effect at the time the Mortgage Loan was originated or acquired and the underwriting guidelines described in the related Purchase Price and Terms Letter;"

- "The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan Application by an appraiser . . . who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to FNMA or FHLMC . . . ;"

- "No Mortgage Loan has a Loan-to-Value Ratio at origination in excess of 95% or as otherwise set forth in the related Purchase Price and Terms Letter;" and

- "No fraud was committed by the Seller in connection with the origination or servicing of the Mortgage Loan and to the best of the Seller's knowledge, no

Countrywide Home Loans, Inc.
April 15, 2011
Page 5

GRAIS & ELLSWORTH LLP

fraud was committed with respect to the Mortgage Loan on the part of the
Mortgagor or any other person involved in the origination of the Mortgage
Loan."

Greenwich MLPSA § 7.02. The Greenwich MLPSA expressly provides that a cause of
action accrues only after demand is made upon Countrywide to repurchase the loans. In
June 2006, Greenwich and Thornburg entered into an Assignment Assumption and
Recognition Agreement, which was acknowledged by Countrywide. Under that
Agreement, Thornburg assumed the rights of Greenwich under the Greenwich MLPSA
with respect to the loans that were transferred into the Trust, including the right to
enforce breaches of representations and warranties. Assignment Agreement § 1.
Thornburg has a right to enforce the remedy for breaches of these representations and
warranties, which is the repurchase of or substitution for a breaching loan.[3] Countrywide
must pay the Trust the outstanding principal balance of the loan and all outstanding
interest on the loan. In the case of liquidated loans, Countrywide must reimburse
Thornburg for the excess of the repurchase price over the net proceeds of liquidation.

Under Section 4.1 of the Greenburg MLPSA and the Assignment Agreement,
Thornburg and the Trust have the right to access the Servicing Files for the loans. The
definition of Servicing Files includes the loan files.

Thus, Thornburg may enforce breaches of representations and warranties on all of
the loans in the Trust that were originated by Countrywide and may access all of the loan
files.

\*

In March 2009, Thornburg and Countrywide settled a repurchase dispute arising
out of a demand by Thornburg that Countrywide repurchase four loans.[4] In that
agreement, Countrywide and Thornburg agreed to mediate disputes about repurchase
demands. Section 10 of the Settlement Agreement states:

> *Mandatory Mediation of Other Existing or Future Claims.* In the
> event that a dispute arises between the Parties with respect to one
> or more mortgage loan repurchase demands under the . . .
> [Thornburg MLPSA] or the [Pooling and Servicing Agreement for
> the Zuni Trust] and the dispute is not resolved by regular business
> negotiations between the Parties, then the Parties each agree to
> submit the dispute to at least one hour of non-binding mediation
> per mortgage loan that is subject to the mediation.

---

[3] The Greenwich MLPSA contains a provision allowing for cure; however, as above, the breaches
described in this letter cannot be cured.

[4] None of the four loans that were the subject of that repurchase dispute are the subject of this
repurchase demand.

GRAIS & ELLSWORTH LLP

The Bankruptcy Trustee has received a repurchase demand from U.S. Bank, the Trustee of the Zuni Trust, which demands that Thornburg repurchase each loan identified in this letter pursuant to the Pooling and Servicing Agreement for the Trust and the Mortgage Loan Purchase Agreement for the Trust. Thus, if a dispute arises about any loan that Thornburg requests Countrywide to repurchase, then the parties must submit the dispute to one hour of non-binding mediation about the mortgage loan.

BREACHES OF REPRESENTATIONS AND WARRANTIES
PROVEN BY THE 57 LOAN FILES

Risk Management Group's review of the 57 loan files in Thornburg's possession determined that all of the 57 loans that Thornburg had files for breached representations and warranties that Countrywide made about them.

For example, loan number 122876260 was a $2.8 million loan. The review of the loan file showed that the loan breached the following representations and warranties, among others:

- Countrywide represented and warranted that the property had been appraised by an independent appraiser and that the appraisal was in a form acceptable to Fannie Mae and Freddie Mac. The loan file shows that the borrower requested a specific appraiser, which is not permitted under Fannie Mae and Freddie Mac standards. The appraisal of the property in the loan file was contingent on improvements, including an all-weather riding arena, paddocks, and a grand prix field. Current housing listings and our investigation show that those improvements were never completed, and so the appraisal was not accurate or complete. The loan file notes that a complete appraisal was never received for the property.

- Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. The property was conditionally appraised for $4.8 million. Nine months before the loan was originated, the property sold for $500,000. A Countrywide employee noted in the loan file that, if the conditional appraisal was used, the property had appreciated 860% in nine months. If a property has been sold in the 12 months prior to a loan being originated it is customary to use the lower of the sale price or the appraised value as the value of the property. Because this was not done, the loan was not originated in a customary manner.

- Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. However, the Countrywide underwriting system describes the borrower's ability to pay as "questionable" and "poor" and states that her debt-to-income ratio of 48.4% and 57.7 % are too high and exceeded the underwriting guidelines. The borrower's credit report shows late payments and numerous credit inquiries in the months before the loan was

GRAIS & ELLSWORTH LLP

originated. Because of the high risk that the borrower would default, as she eventually did, the loan was not underwritten in a prudent way.

- Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. Under Countrywide's underwriting guidelines in effect at the time the loan was originated, the maximum loan amount for a reduced documentation loan like this one was $1.5 million; however, this loan was for $2.8 million. Thus, this loan was not underwritten in a prudent way.

- Countrywide represented that the mortgage loan was originated in a way that was in all respects legal, proper, prudent, and customary. A Countrywide employee noted in the loan file that a manager needed to sign off on the loan before it was funded, but there is nothing in the loan file that shows that a manager ever signed off on the loan. In the loan file, Countrywide employees note that the borrower's husband called and pressured Countrywide to close the loan within 24 hours because he and his wife were leaving the country. Countrywide acquiesced and cut corners to close the loan quickly. This failure to follow protocol shows that the loan was not underwritten in a prudent way.

- Countrywide represented and warranted that the property was "lawfully occupied" and that the borrower would occupy the property as her primary residence. However, house listings for the property show that the interior fixtures in the property were never completed and thus the property was never fit to be occupied.

- Countrywide represented that there was no fraud in connection with the origination of the mortgage loan. However, the initial application for the loan shows the borrower's monthly income as $49,000 but the final application for the loan shows her monthly income of $84,000. This difference is not explained and strongly suggests that the borrower's stated income was fraudulent and that Countrywide made no reasonable inquiry to verify the borrower's income.

Loan number 122876260 is only one example. RMG found breaches of representations and warranties made by Countrywide in each of the 57 files that it examined. For instance, on loan number 115189080, RMG found, among other things, that the borrower's stated monthly income of $39,000 was unreasonable, given that the borrower's highest credit limit was $13,500; the loan did not meet the underwriting guidelines then in effect because Countrywide made unwarranted exceptions to its underwriting guidelines; and the loan, which had a principal balance of $2.25 million and an LTV of 72.5% exceeded the maximum principal balance and LTV for a reduced documentation loan. On loan number 120226750, RMG found, among other things, that the appraised value was not supported by the comparable sales prices that were used to determine that value; the borrower's monthly income of $45,000 was unreasonable, given that there was no record of the borrower's business; and there were insufficient assets to

GRAIS & ELLSWORTH LLP

close the loan. Appendix A summarizes the results of the loan file review for each of the 57 loan files. Because each loan breached the representations and warranties, Countrywide must repurchase it.

For those 57 loan files Countrywide must reimburse the Zuni Parties as follows. Twenty-two of the 57 loans have been liquidated at a loss to the Trust. In total, the losses on those liquidated loans were $15,302,069. Countrywide must reimburse the Zuni Parties for those losses. For the remaining 35 loans, Countrywide must pay the Zuni Parties $39,321,118 plus unpaid interest on the mortgage loans to repurchase the loans.

## INVESTIGATION OF LOANS USING PUBLIC RECORDS

The review of the 57 loan files in Thornburg's possession showed that many of the loans in the Trust breached the representations and warranties. Because we did not have loan files for the other loans that were originated by Countrywide, we used data provided by CoreLogic, the leading provider of data about real property and mortgage loans to investigate the true condition of the loans. Based on the results of this limited investigation, at least 170 of the remaining 298 loans that either were liquidated at a loss to the Trust or remain in the Trust breached the representations and warranties that were made about them.[5] Countrywide is obligated to repurchase each of those loans and any others that breached the representations and warranties.

The investigation focused on three main aspects of the mortgage loans: the accuracy of the appraised values and loan-to-value ratios ("LTVs") of the loans as stated in the Mortgage Loan Schedules to the Thornburg MLPSA and the Greenwich MLPSA, the existence of additional liens on the properties, and the accuracy of statements about owner-occupancy of the properties that secured the loans. There were five parts to our investigation: (i) use of a retroactive automated valuation model ("AVM") on the properties that secured the loans; (ii) research of public records for liens on those properties; (iii) analysis of the property tax records for the properties; (iv) analysis of addresses in the credit bureau files of the borrowers; and (v) analysis of early payment defaults of the loans in the Trust.

### Automated Valuation Model

Using a comprehensive, industry-standard AVM provided by CoreLogic, we determined the true market value of many of the properties that secured loans in the Trust, as of the origination date of each loan. An AVM considers objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. CoreLogic's AVM incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the

---

[5] We also investigated the true condition of all of the loans in the Trust using the same CoreLogic data.

Countrywide Home Loans, Inc.
April 15, 2011
Page 9

GRAIS & ELLSWORTH LLP

population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

There was sufficient information to determine the value of the properties that secured 613 out of the total 1,270 loans in the Trust that were originated by Countrywide and thereby to calculate the correct LTV of each of those loans, as of the date on which each loan was made. On 265 of those properties, the appraised value in the Schedule exceeded the true market value as determined by the model by more than 105%. The amount by which the stated values of those properties exceeded their true market values in the aggregate was $45,164,027. The AVM reported that the appraised value in the Schedule was 95% or less of the true market value on only 151 properties, and the amount by which the true market values of those properties exceeded the reported values was $11,678,485. Thus, the number of properties on which the value was overstated exceeded by nearly twice the number on which the value was understated, and the aggregate amount overstated was nearly four times the aggregate amount understated. For the loans that were liquidated at a loss or that still remain in the Trust, there are 67 loans that were appraised for more than 105% of the value that was stated in the Schedule.

For instance, on loan number 18819532, the loan for $2.835 million was secured by a property that had a reported appraised value of $4.05 million. The AVM determined that the true value of the property was $1.933 million. Thus the reported LTV was 70%, but the true LTV was 147%. On loan number 18834374, the loan for $2.5 million was secured by a property that had a reported appraised value of $3.74 million. The AVM determined that the true value of the property was $1.223 million. Thus the reported LTV was 67%, but the true LTV was 204%. Details of the AVM results for each loan for which the appraised value was 105% or more of the true value as determined by the AVM are given in Table 1 of Appendix B.

**Additional Liens**

According to public land records, 96 of the properties that secured the loans in the Trust that were originated by Countrywide were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of this securitization. Twenty-one of the 96 properties had two additional liens. Details of this analysis are given in Table 2 of Appendix B.

**Property Tax Records**

In some states and counties, the owner of a property may designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to 60 of the properties that were stated in the Schedule to be owner occupied, the owner could have but did not

Countrywide Home Loans, Inc.
April 15, 2011
Page 10

GRAIS & ELLSWORTH LLP

designate the property as his or her homestead. These 60 loans are identified in Table 3 of Appendix B.

For 44 properties that secured the mortgage loans, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself, even though the property was reported to be owner occupied in the Schedule. Such an instruction is strong evidence that the borrower did not live in the mortgaged property or consider it to be his or her primary residence. These 44 loans are identified in Table 3 of Appendix B.

### Addresses in Credit Bureau Files

When a borrower actually occupies a newly mortgaged property, it is virtually certain that some of the entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) will begin sending bills to the address of the newly mortgaged property. If the borrower is not receiving any bills at the mortgaged property six months after the closing of the mortgage, then it is very likely that the borrower does not occupy the mortgaged property. For the properties that secured loans in the Trust, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit files to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Twenty-three borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be primary residences did not receive any bills at the address of the mortgaged property but did receive their bills at an address or addresses that were different from the address of the mortgaged properties. It is very likely that each of these borrowers did not occupy the mortgaged property. These 23 loans are identified in Table 4 of Appendix B.

*

In all, our investigation revealed that 170 of the loans had one or more of the problems described in this section.

### BREACHES OF REPRESENTATIONS AND WARRANTIES
### DEMONSTRATED BY CORELOGIC DATA

With respect to each of the 170 loans discussed above, Countrywide breached at least one of the representations and warranties in either the Thornburg MLPSA or the Greenwich MLPSA. Moreover, 11 loans breached the representation and warranty in the Thornburg MLPSA that all of the loans were owner occupied as a primary residence. (Appendix C states which representations and warranties Countrywide breached with respect to each such loan.) Eliminating duplicates, an additional 176 loans breached the representations and warranties that Countrywide made about them.

### Representations and Warranties About the Mortgage Loan Schedule

In each MLPSA, Countrywide represented and warranted that the information contained in the Mortgage Loan Schedule is complete, true and correct. The Schedules

Countrywide Home Loans, Inc.
April 15, 2011
Page 11

GRAIS & ELLSWORTH LLP

describe, among other things, the LTV at origination of the loan and the occupancy status of the property at origination. For many of the loans the LTV reported in the Schedule was incorrect. For many of the loans the occupancy status of the property reported in the Schedule was incorrect.

With respect to 67 mortgage loans, the reported appraised value of the property was significantly higher than the actual value of the property, as shown by the AVM. Because the appraised value is used as the denominator in the LTV, this evidence shows that the reported LTV in the Schedule was materially incorrect for these 67 mortgage loans.

With respect to 74 mortgage loans, the occupancy status of the property as reflected in the prospectus supplement was incorrect. With respect to 60 mortgage loans, the borrower could have designated the property as his or her homestead but did not. With respect to 44 mortgage loans that were represented to be owner occupied, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. With respect to 23 mortgage loans that were represented to be owner occupied, the borrower did not receive bills at the mortgaged property six months after the loan closed, but did receive bills at a different address. Each of these criteria indicates that the property was not actually owner occupied.

Each of these differences is material and is a breach of the representation and warranty that the information contained in the mortgage loan schedule was complete, true, and correct.

### Representations and Warranties About the Maximum LTV

In each MLPSA, Countrywide represented and warranted that no mortgage loan had an LTV that was higher than 95%. For all of the mortgage loans valued by the AVM, the value determined by the AVM was significantly lower than the actual value of the property, so the actual LTV was higher than the reported LTV because the denominator used to calculate the reported LTV was higher than the true denominator. For 24 mortgage loans, using the true value of the property as determined by the AVM, the actual LTV was more than 95%. These mortgage loans breached the representation and warranty that the LTVs were all 95% or below.

### Representations and Warranties About the Lien Status of the Mortgages

In each of the two MLPSAs, Countrywide represented and warranted that each Mortgage is a valid and enforceable first lien on the Mortgaged Property subject only to exceptions that do not apply here. The 96 mortgage loans where the investigation of public records determined that there were additional liens on the property breached this representation and warranty, and possibly other representations and warranties, because the mortgages were subject to additional liens.

Countrywide Home Loans, Inc.
April 15, 2011
Page 12

GRAIS & ELLSWORTH LLP

**Representations and Warranties About Appraisals and Underwriting Guidelines**

In each of the two MLPSAs, Countrywide represented and warranted that the property was appraised by an unbiased appraiser. Countrywide also represented and warranted that the origination practices were legal, proper, prudent, and customary. An unbiased appraisal is a requirement of legal, proper, prudent, and customary origination practices. Many of the loans did not comply with these standards.

As reported in the 2007 National Appraisal Survey conducted by October Research, before the time of this securitization, brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraised value was not high enough to enable the transaction to close and sometimes by refusing to pay for completed appraisals that were not high enough. This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values;

- the withholding of business if the appraisers refused to guarantee a predetermined value;

- the withholding of business if the appraisers refused to ignore deficiencies in the property;

- the refusal to pay for an appraisal that did not give the brokers and loans officers the property values that they wanted; and

- the black listing of honest appraisers in order to use "rubber stamp" appraisers.

Appraisals made under pressure of this kind are breaches of the representations and warranties about unbiased appraisals. As described above, the number of properties on which the value was overstated was nearly twice the number on which the value was understated, and the aggregate amount overstated was nearly four times the aggregate amount understated. This lopsided result demonstrates the upward bias in appraisals of properties that secured the mortgage loans in the Trust. For the 67 mortgage loans that were liquidated at a loss or that are still in the Trust where the AVM reported a value significantly lower than the reported appraised value, there is strong evidence that the appraisal was biased because the appraisers were not independent. Each such loan breached the representations and warranties about appraisals and legal, proper, prudent, and customary origination practices.

**Representations and Warranties about Fraud**

In each of the two MLPSAs, Countrywide represented and warranted that no fraud was committed by the Seller in connection with the origination or servicing of the Mortgage Loan and to the best of the Seller's knowledge no fraud was committed by any

Countrywide Home Loans, Inc.
April 15, 2011
Page 13

GRAIS & ELLSWORTH LLP

other party involved in the origination of the mortgage loan. Each of the 67 loans that had a biased appraisal was obtained through fraud, which could have been detected by Countrywide. Each of the 74 loans where the occupancy status was misrepresented was obtained through fraud, which could have been detected by Countrywide.

**Representations and Warranties about Occupancy Status**

In the Thornburg MLPSA, Countrywide represented and warranted that the Mortgagor represented that he or she would occupy the property as the primary residence. However, the Mortgage Loan Schedule for the Zuni Pooling and Servicing Agreement states that 11 of the loans that were liquidated at a loss or that are still in the Trust and that were sold under the Thornburg MLPSA were represented to be either investment properties or second homes. These 11 loans are listed in Table 5 of Appendix B. Two of those loans were already reviewed by RMG.

\*

For those 176 loans Countrywide must reimburse the Zuni Parties as follows. Five of the 176 loans have been liquidated at a loss to the Trust. In total, the losses on those liquidated loans were $1,899,522. Countrywide must reimburse the Zuni Parties for those losses. For the remaining 171 loans, Countrywide must pay $140,827,345 plus unpaid interest on the mortgage loans to repurchase the loans.

THORNBURG'S DEMANDS

Pursuant to the Thornburg MLPSA and the Greenwich MLPSA, the Zuni Parties demand that Countrywide repurchase the 57 loans where the loan files have shown that there were breaches of representations and warranties (in the case of loans that were liquidated at a loss, Countrywide must pay the amount of the loss), the 176 loans where our investigation shows that there were breaches of representations and warranties, and any other loans that breached representations and warranties.

Each loan that the Zuni Parties seek to be repurchased arises out of a repurchase demand under the Pooling and Servicing Agreement for the Trust, because U.S. Bank, the Trustee of that Trust, has made a demand to repurchase the loan under the terms of that Pooling and Servicing Agreement. Each loan that the Zuni Parties seek to be repurchased under the Thornburg MLPSA is a repurchase demand under the Thornburg MLPSA as defined by Section 10 of the Settlement Agreement. Thus, under the Settlement Agreement, if a dispute arises with respect to any of the 233 loans the Zuni Parties demand that Countrywide repurchase, the Zuni Parties demand that Countrywide submit to one hour of non-binding mediation about that loan.

As a show of good faith, the Zuni Parties request that Countrywide enter into a tolling agreement to continue to toll any applicable statute of limitations while the parties mediate any disputes that arise about the loans. The Zuni Parties will provide a proposed tolling agreement to Countrywide at Countrywide's request. If Countrywide does not

Countrywide Home Loans, Inc.
April 15, 2011
Page 14

GRAIS & ELLSWORTH LLP

agree to toll the statute of limitations, the Zuni Parties will conclude that Countrywide has refused to mediate the dispute.

Our investigation has shown that 233, of the 355 loans, or 66%, that either remain in the Trust or were liquidated at a loss breached the representations and warranties. Because breaches of the representations and warranties in this Trust were so widespread, Thornburg demands that Countrywide make the loan files for the remaining 298 loans available for inspection and copying by us during the week of April 25, 2011. Thornburg is entitled to those loan files under Section 6.02 of the Greenwich MLPSA and Sections 4.1 and 5.6 of the Thornburg MLPSA . Thornburg will have these loan files reviewed by RMG to determine how many additional loans breached the representations and warranties that Countrywide made about them.

Please make the 298 loan files available to us during the week of April 25, 2011. Please let us know in writing by April 28, 2011 if Countrywide will (1) repurchase the 57 loans where the loan files have demonstrated breaches of representations and warranties, (2) repurchase the 176 loans where CoreLogic data or the review of the schedule has demonstrated breaches of representations and warranties, and (3) enter into a tolling agreement and agree to mediate any disputes about loan files to be repurchased. If we do not receive access to the loan files, or if you do not repurchase all of the loans or agree to a tolling agreement, we will pursue other remedies.

Very truly yours,

*David J. Grais*

David J. Grais
Grais & Ellsworth LLP
40 East 52nd Street
New York, New York 10022

*Attorney for the Certificateholders of
Zuni Mortgage Loan Trust 2006-OA1*

*Richard M. Goldberg*

Richard M. Goldberg
Shapiro Sher Guinot & Sandler, P.A.
2000 Charles Center South
36 South Charles Street
Baltimore, Maryland 21201

*Attorney for Joel I. Sher
Chapter 11 Trustee of TMST, Inc
and TMST Home Loans, Inc.*

Enclosures: Appendices